Citation Nr: 1527818 
Decision Date: 06/29/15 Archive Date: 07/09/15

DOCKET NO. 11-00 547 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Salt Lake City, Utah


THE ISSUES

1. Entitlement to an initial rating in excess of 20 percent for hepatitis C. 

2. Entitlement to an initial rating in excess of 70 percent for a psychiatric disability. 

3. Entitlement to a total disability rating based on individual unemployability (TDIU) prior to September 17, 2013, based on the hepatitis C and psychiatric disability. 

4. Entitlement to service connection for a thoracolumbar spine disability. 

5. Entitlement to service connection for a skin disability. 


REPRESENTATION

Appellant represented by: David E. Holdsworth, Attorney


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

N. Snyder, Counsel


INTRODUCTION

The Veteran had active service from July 1966 to July 1970, with subsequent service in the Naval Reserve and Army National Guard 

This case came before the Board of Veterans' Appeals (Board) on appeal from decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in Salt Lake City, Utah. In October 2012, the Veteran testified at a videoconference hearing before the undersigned. A transcript of the hearing is of record. 

This case was previously before the Board in July 2013. At that time, the Board issued three separate actions. In a remand signed by Veterans Law Judge (VLJ) Peevy, the Board remanded the issue of entitlement to service connection for a prostate disability. Service connection was granted for a prostate disability in an October 2013 rating decision. Thus, that appeal is satisfied, and the issue is no longer before the Board. 

In a decision/remand signed by VLJ Durkin, the Board denied claims for entitlement to earlier effective dates and remanded applications to reopen for the issuance of a statement of the case. The required statement of the case was issued in September 2013. The Veteran did not perfect his appeal by filing a substantive appeal in response to the statement of the case so those issues are not on appeal. The Board also remanded the increased rating claims for additional development. That development has been completed, and the issues have returned to the Board. 

In remand signed by VLJs Peevy, Durkin, and Chiappetta, the Board remanded the issues of service connection for a spine disability and a skin disability for additional development. The Board issued a panel decision in accordance with Arneson v. Shinseki, 24 Vet. App. 379 (2011) because the Veteran provided testimony on the issues at hearings held before VLJs Peevy and Durkin. Subsequent to the July 2013 remand, VLJ Peevy retired and hence is no longer employed by the Board. The Veteran has therefore provided hearing testimony before only one VLJ who will be involved in the adjudication of his claim. As such, a panel decision is no longer necessary.

The record before the Board consists of the Veteran's electronic records in Virtual VA and the Veterans Benefits Management System. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2014).


FINDINGS OF FACT

1. The Veteran's hepatitis C has not resulted in hepatomegaly, weight loss, or near-constant and debilitating symptoms, and it is not associated with symptomatic cirrhosis. 

2. The social and occupational impairment from the Veteran's psychiatric disability does not more nearly approximate total than deficiencies in most areas. 

3. The service-connected hepatitis C and psychiatric disability did not render the Veteran unemployable prior to September 17, 2013. 

4. A thoracolumbar spine disability was not present until many years after active duty, did not originate or permanently increase in severity during a period of duty for training, and is not otherwise related to service. 

5. A skin disability was not present until many years after active duty, did not originate or permanently increase in severity during a period of duty for training, and is not otherwise related to service. 


CONCLUSIONS OF LAW

1. The criteria for a rating in excess of 20 percent for hepatitis C have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.114, Diagnostic Code 7354 (2014). 

2. The criteria for a rating in excess of 70 percent for a psychiatric disability have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code 9411 (2014). 

3. The criteria for a total rating based on unemployability prior to September 17, 2013, due to the service-connected disabilities on appeal have not been met. 38 U.S.C.A. § 1155 (West 2014);38 C.F.R. §§ 3.340, 3.341, 4.16 (2014).

4. The criteria for service connection of a thoracolumbar spine disability have not been met. 38 U.S.C.A. §§ 101, 106, 1110, 1112, 1131, 1137 (West 2014); 38 C.F.R. §§ 3.6, 3.303, 3.307, 3.309 (2014). 

5. The criteria for service connection for a skin disability have not been met. 38 U.S.C.A. §§ 101, 106, 1110, 1112, 1131, 1137 (West 2014); 38 C.F.R. §§ 3.6, 3.303, 3.307, 3.309 (2014). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2014), and the pertinent implementing regulation, codified at 38 C.F.R. § 3.159 (2014), provide that VA will assist a claimant in obtaining evidence necessary to substantiate a claim but is not required to provide assistance to a claimant if there is no reasonable possibility that such assistance would aid in substantiating the claim. 

They also require VA to notify the claimant and the claimant's representative, if any, of any information, and any medical or lay evidence, not previously provided to the Secretary that is necessary to substantiate the claim. As part of the notice, VA is to specifically inform the claimant and the claimant's representative, if any, of which portion, if any, of the evidence is to be provided by the claimant and which part, if any, VA will attempt to obtain on behalf of the claimant. 

The Board also notes the United States Court of Appeals for Veterans Claims (Court) has held that the plain language of 38 U.S.C.A. § 5103(a) (West 2014), requires that notice to a claimant pursuant to the VCAA be provided 'at the time' that or 'immediately after' VA receives a complete or substantially complete application for VA-administered benefits. Pelegrini v. Principi, 18 Vet. App. 112, 119 (2004). The timing requirement enunciated in Pelegrini applies equally to the initial-disability-rating and effective-date elements of a service-connection claim. Dingess v. Nicholson, 19 Vet. App. 473 (2006).

The record reflects that the Veteran was provided all required notice in a letter mailed in September 2009, prior to the initial adjudication of the claims.

The record also reflects that all available service records, VA treatment records, and post-service medical evidence identified by the Veteran have been obtained, including records associated with disability benefits from the Social Security Administration (SSA). In this regard, the Board notes that the service treatment records for the period of active duty only included immunization records. The record reflects that the RO undertook all indicated development to obtain the outstanding service treatment records and that further efforts to obtain the records would be futile. In January 2004 letter, the RO informed the Veteran of the unavailability of the service treatment records and that he should submit any treatment records in his possession. He was also informed of alternative evidence that he could submit.

Neither the Veteran nor his representative has identified any outstanding, existing evidence that could be obtained to substantiate any of the claims; the Board is also unaware of any such evidence. 

The Veteran was provided examinations to determine whether the thoracolumbar spine and skin disabilities are related to service, and the Board finds each opinion is adequate. In this regard, the Board notes that in addition to examining the Veteran, the examiner reviewed the Veteran's pertinent history and properly supported each opinion provided. The Veteran was also provided examinations to determine the nature and severity of the hepatitis C and psychiatric disability, most recently in December 2013. The Veteran has not alleged that either condition has increased significantly in severity since the examination or that the examination was otherwise inadequate. 

Accordingly, the Board will address the merits of the appellant's claims. 

II. Burden of Proof

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under laws administered by the Secretary. The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107 (West 2014); 38 C.F.R. §§ 3.102, 4.3 (2014); see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). 

To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.



III. Increased Ratings

A. Legal Criteria

Disability evaluations are determined by the application of a schedule of ratings that is based upon an average impairment of earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. 

Hepatitis C is rated under Diagnostic Code 7354. It provides that a 20 percent rating is warranted if the disease is productive of daily fatigue, malaise, and anorexia (without weight loss or hepatomegaly), requiring dietary restriction or continuous medication; or incapacitating episodes (with symptoms such as fatigue, malaise, nausea, vomiting, anorexia, arthralgia, and right upper quadrant pain) having a total duration of at least two weeks, but less than four weeks, during the past twelve-month period. A 40 percent rating requires daily fatigue, malaise, and anorexia, accompanied by minor weight loss and hepatomegaly; or incapacitating episodes (with symptoms such as fatigue, malaise, nausea, vomiting, anorexia, arthralgia, and right upper quadrant pain) having a total duration of at least four weeks, but less than six weeks, during the past twelve-month period. A 60 percent rating requires daily fatigue, malaise and anorexia with substantial weight loss (or other indication of malnutrition) and hepatomegaly; or incapacitating episodes (with symptoms such as fatigue, malaise, nausea, vomiting, anorexia, arthralgia, and right upper quadrant pain) having a total duration of at least six weeks, during the past twelve-month period, but not occurring constantly. Finally, a 100 percent rating requires near-constant debilitating symptoms such as fatigue, malaise, nausea, vomiting, anorexia, arthralgia, and right upper quadrant pain. 38 C.F.R. § 4.114, Diagnostic Code 7354.

Following the criteria, Note (1) indicates that sequelae, such as cirrhosis or malignancy of the liver, are to be evaluated under an appropriate diagnostic code, but should not be based on the same signs and symptoms as the basis for evaluation under DC 7354. Note (2) provides that, for purposes of evaluating conditions under Diagnostic Code 7354, an "incapacitating episode" means a period of acute signs and symptoms severe enough to require bed rest and treatment by a physician.

Under 38 C.F.R. § 38 C. F.R. § 4.112, the term "minor weight loss" means a weight loss of 10 to 20 percent of the individual's baseline weight, sustained for three months or longer. The term "substantial weight loss" means a loss of greater than 20 percent of the individuals' baseline weight, sustained for three months or longer. "Baseline weight" means the average weight for the two-year period preceding the onset of the disease.

When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a) (2014). 

Pursuant to Diagnostic Code 9411, a psychiatric disability is rated 70 percent when there is occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships. 

A 100 percent disability rating is warranted if there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; gross inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation or own name. 38 C.F.R. § 4.130, Diagnostic Code 9411.

The symptoms listed are not intended to constitute an exhaustive list, but rather serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). 

In assessing the evidence of record, it is important to note that the Global Assessment of Functioning (GAF) score is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Richard v. Brown, 9 Vet. App. 266, 267. A GAF score of 31 to 40 represents some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). A GAF score of 51 to 60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF of 61 to 70 is defined as some mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well, has some meaningful relationships. 

It is the established policy of VA that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. 38 C.F.R. § 4.16. A finding of total disability is appropriate, "when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." 38 C.F.R. §§ 3.340(a)(1), 4.15 (2014).

"Substantially gainful employment" is that employment, "which is ordinarily followed by the nondisabled to earn their livelihood with earnings common to the particular occupation in the community where the veteran resides." Moore (Robert) v. Derwinski, 1 Vet. App. 356, 358 (1991). Marginal employment is not considered substantially gainful employment. 38 C.F.R. § 4.16(a).

In determining whether unemployability exists, consideration may be given to a veteran's level of education, special training, and previous work experience, but not to his age or to any impairment caused by nonservice-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19 (2014).

A TDIU may be assigned if the schedular rating is less than total when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability, ratable at 60 percent or more, or as a result of two or more disabilities, provided that at least one disability is ratable at 40 percent or more and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a).

Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

B. Analysis

In accordance with 38 C.F.R. §§ 4.1, 4.2 (2014) and Schafrath v. Derwinski, 1 Vet. App. 589 (1991), the Board has reviewed all evidence of record pertaining to the history of the service-connected disabilities. The Board has found nothing in the historical record which would lead to the conclusion that the current evidence of record is not adequate for rating purposes. Moreover, the Board is of the opinion that this case presents no evidentiary considerations which would warrant an exposition of remote clinical histories and findings pertaining to the disabilities. 

Hepatitis C

VA treatment records reveal no findings of hepatomegaly and consistently negative findings as to ascites or jaundice. March 2010 VA treatment records indicate that the Veteran began treatment with Interferon on March 1, 2010, and that treatment was discontinued on March 29, 2010, due to chest pain. An April 2010 VA treatment record indicates that the Veteran was ordered to stop Interferon treatment as it had resulted in "salient" fatigue. The record reveals negative findings as to hepatosplenomegaly. The record also reveals the Veteran's history of "good" appetite. A June 2010 Vet Center record indicates that the Veteran denied excessive fatigue. 

An October 2010 VA examination record reveals the Veteran's history of fatigue, malaise, and "some nausea." He denied vomiting, abdominal pain, anorexia, or arthralgia, and he did not have symptoms severe enough to require bedrest by a physician. He denied other symptoms or treatment, including prescription of a special diet. The examiner found the Veteran had no restrictions on his activities of daily living or occupational endeavors due to the hepatitis C. Examination revealed a weight of 162 pounds. There was no hepatosplenomegaly or signs of jaundice, palmar erythema, or malnutrition. The examiner diagnosed hepatitis C. 

A March 2012 VA examination record reveals the Veteran's history of increased pain in the upper quadrant and nausea if he does not have something in his stomach. He denied frequent vomiting but reported emesis occurred once or twice per year. The examiner determined that the Veteran had fatigue, nausea, and right upper quadrant pain and that the condition required dietary restriction of no alcohol or fatty food. The examiner found the Veteran had at least one week but less than two weeks of incapacitating episodes due to the liver condition over the previous 12 months. The examiner found the Veteran had abdominal pain due to cirrhosis. There was no hepatosplenomegaly or ascites. The examiner found the condition did not impact the Veteran's ability to work. 

A March 2012 VA treatment record indicates that the Veteran's previous attempt at treatment with interferon/ribavirin in 2009 was complicated by overwhelming fatigue and exertional chest pain with dyspnea so it was terminated after three months. He reported a "few" symptoms of occasional abdominal swelling which resolves spontaneously, "some" right upper quadrant tenderness, and "some" nausea. He denied vomiting, jaundice, lower extremity edema, hematemesis, melena, decreased appetite, and confusion. No hepatosplenomegaly was found. The record notes that the available biopsy evidence suggested the Veteran did not have severe cirrhosis. A March 2012 VA examination record indicates that when asked about the most difficult things that he was dealing with currently, the Veteran reported medical problems unrelated to the hepatitis C and did not report any symptoms ever attributed to the hepatitis C. 

A January 2013 VA treatment record reveals the Veteran's history of near-constant fatigue, malaise, nausea, arthralgia, and anorexia. There was no ascites, confusion, or jaundice. A February 2013 computerized tomography (CT) scan showed no evidence of cirrhosis. However, an examining physician believed the Veteran "probably" had early cirrhosis based on downward trending platelet counts and fragmentation on a 2008 liver biopsy. A July 2013 ultrasound of the liver showed normal findings without evidence of hepatocellular carcinoma. An August 2013 VA treatment record notes the Veteran's history of constant fatigue, malaise, daily morning nausea, intermittent abdominal pain, diffuse muscle pain, arthralgia, and decreased appetite. He also reported that he "sometimes" stayed in bed for days because of his fatigue, reporting that it last occurred three weeks earlier. The record notes that the Veteran's weight was stable. Based on imaging and the physical exam, the examiner determined the Veteran "did not appear to have cirrhosis." 

An October 2013 VA treatment record indicates that the Veteran reported a "good" appetite. November and December 2013 VA treatment records indicate that the Veteran denied abdominal pain. 

A December 2013 VA examination record reveals the Veteran's history of generalized malaise, daily nausea with vomiting if he does not eat within one hour after waking, and right upper quadrant pain. He reported joint pains "all over his body' but concentrated in the shoulders, hips, and ankles," which the Veteran believed was arthralgia. He also reported getting "flu-like" symptoms once or twice a year which require him to spend a week or two in bed. He indicated that because of his hepatitis he had to change his diet and remove all alcohol. He explained that he was able to perform daily tasks but his energy level was "very low." Continuous medication was not required for control. The examiner found the hepatitis C was manifested by daily fatigue, daily malaise, daily nausea, daily arthralgia, daily right upper quadrant pain, and dietary restriction in the form of no alcohol. The examiner found no symptoms were near-constant and debilitating. There were no signs or symptoms attributable to cirrhosis. The examiner found the liver condition affected the Veteran's ability to work. The examiner explained that the hepatitis C precludes the Veteran from performing certain medical jobs. The examiner added that the hepatitis had not progressed to include cirrhosis or hepatocellular carcinoma and it was determined to be stable. The examiner added that the Veteran described symptoms which in combination with other health concerns would preclude physical labor. However, the examiner noted that the Veteran was caring for his small children and was able to perform all activities of daily living without assistance. The examiner added that the Veteran's mild nausea, fatigue, and joint aches did not limit the ability to perform sedentary employment. 

A June 2014 VA treatment record reveals the Veteran felt "healthy" other than his incontinence and symptomatic right inguinal hernia. 

Upon consideration of the evidence, the Board finds a rating in excess of 20 percent is not warranted at any time for the Veteran's hepatitis C. There is no evidence of hepatomegaly or weight loss. In this regard, the Board notes that the Veteran's weight was generally stable during the pendency of the claim, normally noted to be in the 160s, with an increase in weight from 161 pounds in August 2009 to 173 pounds in April 2013. There is also no probative evidence of at least 4 weeks of incapacitating episodes in a 12-month period. In this regard, the Board notes that although the Veteran has reported episodes where he is bedridden, there is no evidence of treatment by a physician during one of these reported episodes and there is no evidence that the hepatitis C results in at least four weeks of bedrest per 12 month period. The Board acknowledges that the Veteran reported being bedridden for up to four weeks per year due to flu-like symptoms. Neither the Veteran nor the medical records have attributed these symptoms to the hepatitis C, however. Moreover, there is no evidence of medical treatment for any of these episodes. As such, this history is not probative evidence which could warrant a higher rating. 

The Veteran contends that a 100 percent rating is warranted because he has the symptoms enumerated in the total rating criteria. In January 2011, he reported "constant, debilitating" symptoms and he reiterated this history during the 2012 hearing and in a December 2012 statement. These histories are contradicted by the medical records, however, which reveal histories indicative of a symptomatic frequency far less than "near-constant" prior to January 2015 and no histories suggestive of debilitating symptoms at any time. In this regard, the Board notes that the treatment records consistently note the Veteran's ability to perform his activities of daily living, even when doing the Interferon treatment in 2010, and to care for his children and take educational classes and indicate that the symptoms occur "sometimes" or "intermittently," which the Board finds does not approximate near-constant frequency. Furthermore, when asked about the most difficult things he faced during a March 2012 VA examination, the Veteran did not report any symptoms associated with the hepatitis C, instead discussing cataracts and prostate issues. The Board finds the findings and histories reported in the medical records are more credible, and thus, more probative, than the histories presented in the aforementioned statements. 

The Board has considered whether there is any other schedular basis to assign a higher or separate rating but finds no basis for such a rating. There is no evidence of malignancy of the liver, and although there is medical evidence of cirrhosis, there is no evidence of any signs or symptoms associated with the cirrhosis which are not considered in the rating assigned for the hepatitis C. In this regard, the Board notes that the medical evidence suggests that the cirrhosis is predominantly asymptomatic: it does not show associated portal hypertension, splenomegaly, ascites, hepatic encephalopathy, hemorrhage, portal gastropathy, or jaundice, only abdominal pain has ever been attributed to the cirrhosis, and the abdominal pain attributed to the cirrhosis by the 2012 VA examiner is contemplated by the currently assigned rating for hepatitis C 

The Board has also considered whether the Veteran's claim should be referred to the Director of the Compensation Service for extra-schedular consideration under 38 C.F.R. § 3.321. In determining whether a case should be referred for extra-schedular consideration, the Board must compare the level of severity and the symptomatology of each disability with the established criteria provided in the rating schedule for disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is therefore adequate, and no referral for extra-schedular consideration is required. Thun v. Peake, 22 Vet. App. 111, 115 (2008).

The rating criteria specifically provide for ratings based on the symptoms endorsed by the Veteran with higher ratings available for more severe manifestations. The medical evidence reflects that the hepatitis C does not result in impairment more severe than that contemplated by the current rating. The diagnostic criteria adequately rate the severity and symptomatology of the hepatitis C. Therefore, the Board has determined that referral of the claim for extra-schedular consideration is not in order.

Psychiatric Disability 

In February 2010, the Veteran submitted a statement endorsing psychiatric symptoms of flat affect, circumstantial speech, occasional panic attacks, and moderate difficulty in social and occupational functioning. A March 2010 VA treatment record reveals the Veteran's history of "some" feelings of depression. The Veteran's spouse denied that he had "any issues" with anger, mood swings/changes, or violent outbursts. An August 2010 VA treatment record reveals the Veteran's history of insomnia, minor depression, and "a temper." He denied suicidal ideation. Regarding his anger, the Veteran reported that he has problems with anger towards his wife. He explained that he does not hurt her but will strike the wall at home and leave the area when angry. He also reported having daily flashbacks and nightmares if he does not get adequate sleep. 

A January 2010 SSA examination record indicates that the Veteran endorsement of symptoms included flashbacks, avoidance of crowds, hypervigilance, survivor's guilt, and anger. He reported that he had "horrible anger" and that he is very jumpy and reacts physically "at times" if touched from behind. He also reported two instances of domestic violence due to anger and inability to deal with stress. He added that he had chosen jobs where he might work away from people and indicated that he was able to work steadily until his back became problematic. 

Examination revealed that the Veteran was oriented to time, place, and person, with appropriate dress. His state of consciousness was cognizant and clear, and his fund of general knowledge and use of vocabulary were average. His abilities to concentrate, attend, and do simple math were average. There was no impairment of speech, concentration, or memory, and affect was appropriate. Thought processes and cognitive functioning were age-appropriate, coherent, and logical. The Veteran denied hallucinations, delusion, or psychotic symptoms, and quality of thinking during evaluation suggested the Veteran's reality testing was age-appropriate and adequate. He reported irritability with his wife and children, increased as the day progressed. The examiner assigned a GAF score of 50-55. The examiner noted that despite the Veteran's PTSD symptoms, he was able to work effectively until 2007, at which time the Veteran had little work as a realtor because of the poor housing market/economy. A February 2010 SSA record reveals a medical consultant's determination that the Veteran appeared capable of performing and persisting at a range of simple to slightly more complex work activities with no more than moderate public contact. 

March and April 2010 Vet Center records note that the Veteran seemed anxious or depressed and that the Veteran had marital difficulties. The Veteran denied risk of harm to self or others. He reported physical altercations with his wife in the past, one time with him getting physical with her. He indicated that he would not do it again. Severe PTSD was diagnosed. A June 2010 Vet Center record reveals the Veteran's history that he was married, though the marriage was tumultuous. The Veteran denied suicidal thoughts, homicidal thoughts, irritability or aggression with little or no provocation, anxiety, depression, apathy, affective liability, speech difficulty, or slowed thinking. He reported symptoms including feelings of hopelessness or despair, insomnia, nightmares, intrusive memories, difficulty concentrating, irritability, angry outbursts, and low energy. Examination revealed anxious manner and affect. The Veteran was oriented to place and person but not time. Speech had a retarded pace, and associations were abnormal. Judgment was fair, and there were no delusions or hallucinations. There was disorganized thinking, motor activity was tense, and memory function was impaired. The examiner diagnosed severe and chronic posttraumatic stress disorder (PTSD) resulting in intense, unstable relationships and sporadic work history. The examiner noted that the Veteran had a history of avoidance, hyperarousal, psychic numbing, chronic sleep problems, social isolation, and alienation. The examiner assigned a GAF score of 35. 

A September 2010 VA examination record reveals the Veteran's history of symptoms including irritability, anger, nightmares, anxiety, sleep impairment, detachment, and hypervigilance. He reported working as a carpenter until he hurt his back and then working as a rater until he was let go because he was "too generous." He explained that he was officially told that he was let go because of his writing style. He reported that his psychiatric disability had negatively affected him at his jobs over the years, explaining that he could no longer do acute care as a nurse because the blood reminded him of his medic duties and that his anger and irritability caused conflicts with coworkers and supervisors. He reported that his psychiatric disability had negatively affected his marriage because his anger and irritability created emotional distance from his wife, she tired of his hypervigilant behavior, and they were unable to share a bed due to nightmares and hypervigilant behavior. The Veteran reported that his psychiatric symptoms affected his relationship with his sons because he isolates himself when he is angry and irritable. He reported that he was the main caregiver and often gets overwhelmed with stress and anxiety, resulting in an occasional decrease in parenting efficiency. He reported that he sees one brother and one friend. He added that his wife did not like him having too many friends. He reported marital discord and a history of domestic violence with his wife. 

Examination revealed fair-to-good hygiene. The Veteran was restless and tense but cooperative and attentive. Speech was normal. Mood was anxious and depressed, and affect was restricted. Thought processes were normal. There were intrusive memories of combat trauma. There were no delusions or hallucinations. The Veteran reported having suicidal ideation one time per month but denied plan or intent. He denied homicidal ideation. The Veteran was oriented to person, place, and date. There were deficits in concentration and recent memory, but remote and immediate memory were intact. Judgment and insight were intact. The examiner concluded that there was no impairment in thought process or communication. However, the examiner noted that the Veteran reported that his difficulty concentrating and retaining information negatively affected him while working and affected his relationship with his wife and children. The examiner diagnosed PTSD and major depressive disorder and assigned a GAF score of 61. The examiner opined that the psychiatric disorder resulted in occupational and social impairment with occasional decrease in work efficiency where there are intermittent periods of inability to perform occupational tasks but generally satisfactory functioning due to depressed mood, anxiety, suspiciousness, weekly panic attacks, chronic sleep impairment, and mild memory loss. 

A March 2012 VA treatment record reveals the Veteran's history of marital discord. He did report a good relationship with his children. The Veteran reported that he had been going to school but withdrew due to visual impairment. He expressed anger and irritation about his wife attending school. He reported that he previously worked for VA but was not kept past the probationary period because he did not fit in. He reported a general sense of irritability and lack of energy. He added that his irritability increased when tired or if "harassed" in the evening. He reported that he needs alone time and explained that he was socially isolated and had no friends. 

Examination revealed that the Veteran was fully oriented and adequately groomed. The examiner found the Veteran was inconsistent in his story, noting that the Veteran omitted important information when directly asked and, "seemed to have a difficult time recalling dates." The examiner found the Veteran was a poor historian. The examiner also found that the Veteran often became derailed by thoughts of other symptoms he wanted to report instead of elaborating on those being directly queried. He was not tangential, however, and speech was normal. Affect was somewhat flat. Thought process and content were normal, and he denied homicidal ideation or hallucination. The Veteran reported occasional suicidal ideation, reporting that it last occurred "maybe a week ago." He explained that he had the thoughts when he was under stress or getting screamed at. He denied plan or intent. The psychologist found the Veteran's report of symptoms "appear very mild" but met the minimal diagnostic criteria. The examiner added that the Veteran reported questionable experiences marked by inconsistencies and was inconsistent within the interview itself. The psychologist added that the Veteran's self-reports were inconsistent with records and he omitted important details in a manner that appeared self-favorable. The psychologist noted that although the Veteran initially reported that loud noises did not bother him, he later stated that they did bother him though he worked construction for 30 years. The psychologist found the Veteran's most significant impairment was social functioning, particularly within his marriage which exacerbates his anger and irritability. The psychologist stated that the degree of impairment associated with PTSD versus personality characteristics/interpersonal skills was unclear. The psychologist diagnosed mild PTSD and assigned a GAF score of 61. 

A March 2012 VA examination record reveals the Veteran's history of sleep disturbance, intrusive thoughts, depressed mood, anxiety, avoidance, angry outbursts, and hypervigilance. He reported occasional suicidal thoughts without plan. He denied panic attacks since the previous examination and reported two panic attacks in his lifetime, most recently occurring in 2006 or 2007. He denied inability to express emotion. He reported that his ability to concentrate was "generally good." The Veteran reported marital discord. He explained that he can only be around his wife for so long because he will "snap," explaining that he has approximately one verbal anger outburst per day, usually about his wife. He indicated that he had a good relationship with his children, however, explaining that he loved them "very much" and can express his emotions with them "very well." He reported that his wife did not let him have friends and he denied having close friends, though he reported enjoying talking to a neighbor. He reported that he could still experience a "good amount of joy" in his life. The Veteran reported that he had stopped working because of his back and had stopped going to school because of visual impairment. 

Examination revealed good hygiene. He denied physical violence against anyone since the previous examination though he reported kicking his wife in the butt when she verbally attacked his son. He also reported damaging a vacuum after his wife complained he did not vacuum enough. He reported that he had not seriously contemplated suicide since the last examination though he had occasional thoughts. Orientation, speech, thought process, and behavior were normal, and there was no problem with impulse control. Affect was mostly full though slightly anxious at times. He was able to recall 2/3 items after five minutes without prompting and 3/3 with a single prompt. Remote memory was intact. Judgment and insight were marginal to fair. The examiner found the Veteran's symptoms were overall mild. The examiner assigned a GAF score of 60 and opined that the psychiatric disability resulted in occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily with normal routine behavior, self-care, and conversation. 

An April 2012 VA treatment record reveals that the Veteran denied suicidal or homicidal ideation. He was alert but appeared anxious. Mood was depressed, and affect was blunted. 

At the October 2012 hearing, the Veteran testified that he had memory impairment and constant homicidal ideation. He reported that he did not feel safe maintaining himself in his home because of his wife's behavior. He added that he had an inability to handle stressful circumstances, and to establish and maintain relationships. He reported that he did not have any friends and was very isolated. He reported a "very good" relationship with his children. 

An October 2012 VA treatment record reveals the Veteran's history of homicidal ideation towards his wife with no plan or intent. He explained that he felt enraged towards her and indicated violence was a "real possibility." Speech was regular but very ruminative and tangential, and affect was mostly flat. The record also indicates that the Veteran had a verbal altercation with a teacher at his children's school. 

VA treatment records dated in May and July 2013 reveal findings of normal speech, normal affect, normal response to orientation, full orientation, and no suicidal ideation. An October 2013 VA treatment record reports that the Veteran was taking college classes and taking care of the children. 

A December 2013 VA examination record reveals the Veteran's history that he was let go from his previous job as a rater because he did not fit in and his attitude was perceived to be "too generous." He reported diminished occupational performance due to hypervigilance, sleep impairment, and impairment of concentration. He also reported severe trouble getting along with coworkers and trouble with authority figures. He reported persistent flashbacks and nightmare, isolation, memory impairment, avoidance of crowds, panic attacks, exaggerated startle reflex, detachment, guilt, suicidal ideation without intent or plan, constant depression, diminished interest in significant activities, inability to feel positive emotions, and lack of trust. He reported being very irritable and angry and having a hair trigger. He indicated that he was charged with domestic violence three times. He explained that in 2005, he threw his wife in the front door in order to get alone time. Then, in 2008, he needed time alone and he was trying to back out when he heard his wife yell and saw her behind the rear wheel. He had not known she was there but when he found her, he became enraged and kicked her in the butt and a neighbor called the police. Then, in 2013, he threw a cup of water on his wife. The examiner noted that the Veteran endorsed symptoms of depressed mood, anxiety, near-continuous panic, or depression affecting the ability to function independently; chronic sleep impairment; mild memory loss; flattened affect; difficulty in adapting to stressful circumstances; impaired impulse control; and inability to establish and maintain effective relationships. 

Examination revealed appropriate dress with no evidence of impairment of thought process, speech, or communication, delusion, hallucination, or inappropriate behavior. The Veteran had the ability to maintain minimal personal hygiene and other basic activities of daily living and he was oriented to person, place, and time. Affect was flattened. Insight, judgment, and impulse control were fair. The examiner determined that the Veteran's psychiatric disability resulted in trouble focusing and concentrating at work resulting in inability to complete assignments in a timely fashion; trouble getting along with coworkers and authority figures resulting in repeated loss of jobs; impaired impulse control under stressful circumstances with tendencies for violent behavior; and severe hyperarousal symptoms at night resulting in diminished performance at work. The examiner found the psychiatric disabilities rendered the Veteran unable to secure and maintain substantially gainful employment. The examiner further found the psychiatric disability resulted in occupational and social impairment with deficiencies in most areas. 

VA treatment records dated in January, February, and April 2014 reveal findings of normal speech, normal affect, normal response to orientation, full orientation, and no suicidal ideation. 

Upon consideration of the evidence, the Board finds a rating in excess of 70 percent is not warranted because the evidence does not demonstrate social and occupational impairment that more nearly approximates total than deficiencies in most areas. The Board acknowledges that a Vet Center examiner assigned a GAF score indicative of "major" impairment. GAF scores must be considered in light of the actual symptoms of the veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a). This is due, in part, because the scores and assessments are generally based on the veteran's symptoms that particular day, rather than based on any long-term symptomatology. 

Initially, the Board notes that the Veteran has provided varying accounts of his symptoms and impairment, which results in a diminished level of credibility. In this regard, the Board notes that the Veteran has provided contradictory accounts of why he kicked his wife and why he left his jobs and contradictory symptomatic histories including whether he has or has had panic attacks, loss of interest, or emotional distance from his children. The Board finds the disability picture created by the overall record indicates that the Veteran is able to maintain a close and loving relationship with his children and is able to care for them on a daily basis. He is able to perform all activities of daily living and self-care and the evidence does not suggest a finding of even intermittent inability to function independently. He has passive suicidal thoughts but does not and has not posed an actual risk of harm to himself. He has issues with impulse control and anger, particularly with his wife, but is generally able to control his behavior and his anger has rarely resulted in physicality towards another person. There is no evidence of absence of contact with reality and behavior is generally appropriate. His speech and thought process have almost always been found to be normal. No medical professional has ever opined, and the evidence does not otherwise show, that the social and occupational impairment from the disability has more nearly approximated the total impairment required for a 100 percent rating at any time during the period of the claim. For these reasons, the Board finds that a rating in excess of 70 percent is not warranted at any point during the pendency of the claim.

The Board has considered whether this claim should be referred to the Director of the Compensation and Pension Service for extra-schedular consideration. As explained above, the manifestations of the disability and their impact on social and occupational functioning are contemplated by the schedular criteria. Therefore, referral of this claim for extra-schedular consideration is not warranted. 

Additional Considerations

In reaching the above determinations, the Board has carefully reviewed and considered the Veteran's statements regarding the severity of his hepatitis C and psychiatric disabilities. Nevertheless, the competent medical evidence offering detailed specific specialized determinations pertinent to the rating criteria are the most probative evidence with regard to evaluating the pertinent symptoms for the disabilities on appeal; the medical evidence also largely contemplates the Veteran's descriptions of symptoms. The lay statements have been considered together with the probative medical evidence clinically evaluating the severity of the pertinent disability symptoms.

The Board has considered whether a total disability rating based on individual unemployability (TDIU) is warranted under Rice v. Shinseki, 22 Vet. App. 447 (2009). In a December 2014 rating decision, the Veteran was awarded a TDIU effective September 17, 2013, which is the date of the formal claim for a TDIU. The Veteran has not appealed the effective date assigned in the December 2014 rating. Nevertheless, the Board has reviewed the record to determine whether a TDIU is warranted based on the hepatitis C and psychiatric disability prior to that date. 

Upon consideration of the evidence, the Board finds a TDIU is not warranted prior to September 17, 2013, based on the hepatitis C and psychiatric disability. Although the record includes the Veteran's histories of not working and histories of debilitating symptoms associated with the hepatitis C and severe symptoms associated with the psychiatric disability, as discussed above, the Board has found those histories are not credible, and thus not probative. There is no medical finding of unemployability due to either or both disability during this period, and the medical evidence documents that the Veteran was able to be the caretaker for his children and that he was able to return to school before stopping due to unrelated issues. The Board acknowledges that the December 2013 VA examiner determined that the psychiatric disability resulted in an inability to work. This determination was based on newly provided histories, however, notably a newly provided history of losing multiple jobs due to the psychiatric disability and new symptomatic histories of constant depression and periods of inability to function independently, which would indicate a worsening of the psychiatric disability as of that date. Prior to December 2013, the Veteran's histories did not suggest total or near-total occupational impairment due to the psychiatric disability, and VA examiners determined the disabilities did not render the Veteran unemployable. 

The Board has determined that the most probative (persuasive) evidence that specifically addresses the question of whether the Veteran is unable to secure or follow a substantially gainful occupation as a result of his service-connected psychiatric disability and hepatitis C during this time period weighs against the claim. Accordingly, entitlement to a TDIU due to the service-connected psychiatric disability and hepatitis C is not warranted prior to September 17, 2013. 

Finally, the Board has considered the doctrine of reasonable doubt but has determined that it is not applicable to these claims because the preponderance of the evidence is against the claims.

IV. Service Connection

A. Legal Criteria 

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active duty or active duty for training or for disability resulting from injury incurred in or aggravated by inactive duty for training. 
38 U.S.C.A. §§ 101, 106, 1110 (West 2014); 38 C.F.R. §§ 3.6, 3.303.

Where a veteran served for at least 90 days during a period of war and manifests arthritis or a malignant tumor to a degree of 10 percent within one year from the date of termination of such service, such disease shall be presumed to have been incurred or aggravated in service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112; 38 C.F.R. §§ 3.307, 3.309. The record does not include any examination records coinciding with the periods of active duty for training. As such, the presumption of soundness does not apply to the periods of active duty for training.

Service connection may be granted for any disease initially diagnosed after discharge, when all the evidence, including that pertinent to service, establishes the disease was incurred in service. 38 C.F.R. § 3.303(d). 

B. Thoracolumbar Spine Disability 

The Veteran contends that he strained his back while lifting body bags up a ladder for hours during service. He has not reported treatment during service but reported that after performing this duty, he had severe pain in his back for the next months. He reported that the pain was initially intermittent and progressed to being constant. 

A January 1972 medical notation indicates that the Veteran was examined and found to be physically qualified to perform active duty/active duty training and that there was no significant change in physical condition since the last physical. A June 1974 medical notation indicates that the Veteran denied a material change in his physical condition since the last examination. A July 1976 Reserve reenlistment examination record reveals normal clinical evaluation of the spine and negative history as to recurrent back pain. A May 1977 notation indicates that the Veteran was found to be physically qualified for release from active duty for training. 

July 1998 private medical records reveal treatment for thoracic and lumbar strain. The records indicate that the pain began in June 1998, after he was pulling on a form. He reported a history of back pain that resolved in 1980. 

A November 1998 private treatment record reveals the Veteran's history of back pain since a "strain" in June 1998. The diagnosis was myofascial back pain. Subsequent records reveal continued treatment for mid-thoracic back pain, with a myofascial component. A December 1998 record indicates that the myofascial pain was secondary to a hereditary neuropathy. 

An April 1999 private treatment record reveals the Veteran's history of low back pain which began in 1980 with a slipped disc. He reported that the pain improved and he was "doing well" until approximately one year earlier, when he strained it. He reported pain since the re-injury. 

A July 2003 VA treatment record reveals the Veteran's history of low back pain. He reported that he had been diagnosed with scoliosis and that X-ray images showed arthritis and questionable ankylosis. Examination revealed mild scoliosis in the lower thoracic region. A September 2003 VA treatment record reveals the Veteran's history of service duties involving lifting and carrying body bags up ladders. He denied being wounded or injured during service. Subsequent records reveal histories of low back pain. 

A February 2008 VA treatment record reveals the Veteran's history of lower back pain, worse with movement. The examiner noted that the Veteran had a history of back pain. The examiner reported that the fact that the pain was related to movement suggested a musculoskeletal origin. 

July and August 2008 private treatment records reveal the Veteran's history of injuring his back trying to move a pallet at work. The diagnosis was thoracolumbar strain. July 2008 radiographic imaging showed multilevel degenerative changes. A September 2008 private treatment record reveals the Veteran's history of chronic back pain since a work injury in 1980, with an increase in symptomatology after a June 2008 injury. An October 2008 VA treatment record reveals the Veteran's history of low back pain with an original injury in the 1980s. Radiographic imaging showed severe degenerative disc disease with some retrolisthesis. November 2008 VA treatment record reveals the Veteran's history of injuring the back in 1980 and June 2008. During one appointment, he reported chronic low back pain since 1980 when he was involved in an industrial accident with an exacerbation in June 2008, after a workplace injury. During another appointment, he reported low back pain after the 1980 injury that resolved and then chronic low back pain after the June 1998 injury. The diagnosis was lumbar strain/sprain with spondylosis

A March 2009 SSA evaluation record reveals the Veteran's history of three injuries of the back. The Veteran reported that the first injury was in 1980, when a crane operator hit a form he was on, sending him through a window and resulting in a herniated disc. He reported that the symptoms, "resolved 100% for 10 years, but then he developed some arthritis." He reported that he then reinjured the back in 1998, when it "just popped" on the job, after which time he underwent therapy and was put on light duty. He reported that he recovered to preinjury status until June 2008, when he injured the back. He, "denied having been symptomatic whatsoever with any back problems in the year predating June 2008," and added that he, "only had a little arthritic pain in the years prior to 2007." After examination, the diagnosis was thoracolumbar degenerative disc disease and joint disease with secondary listhesis and stenosis. 

A December 2013 VA examination record reveals the Veteran's history of injuring the back after having to lift body bags up ladders for several hours. He reported that the injury forced him to need several days off. He also reported several other back injuries after service. After examination, the examiner diagnosed degenerative disc disease, degenerative arthritis, and lumbar spondylosis. The examiner determined that it was less likely than not that the thoracolumbar spine disability was incurred in or cause d by service. The examiner explained that review of the Veteran's medical records does not show any complaints of chronic lower back
pain until the late 1990s and that the Veteran's occupation over the last 30 years included work as a registered nurse and as a carpenter, both of which require lifting and can be physically intensive occupations. The examiner found the Veteran's statement that he initially injured his back while lifting and transporting body bags was credible but did not explain the degeneration in the back and widespread disc bulging. Given the Veteran's age of 66 and long history of physical work, with no complaints relating to his back until nearly 30 years after separation from service, the examiner found it was most likely that the Veteran's current back conditions are a consequence of degeneration related to age and heredity.

Following consideration of the evidence, the Board concludes service connection is not warranted for a thoracolumbar spine disability. 

Initially, the Board finds a preponderance of the evidence shows that a thoracolumbar spine disability was not present during active duty. Medical evaluations in the 1970s revealed no history or finding of a chronic back abnormality, the 1976 Reserve examination revealed normal clinical findings and negative history as to back disability, the first diagnosis reportedly occurred in 1980, 10 years after discharge from active duty, and the first diagnosis of record dates in 1998, 28 years after separation from service, both reportedly occurring after intercurrent injury to the back. Additionally, although competent to do so, the Veteran has not reported chronic back symptoms during and since active service. Furthermore, a VA examiner has provided a probative opinion that the back disability was not present during service. 

The Veteran currently asserts that he had intermittent back pain after an injury during active duty. Although the Veteran is competent to report his symptomatic history and has training as a registered nurse, the Board finds the Veteran's history is not probative evidence of a chronic disability during active service. Initially, the Board finds the history of recurrent symptoms prior to 1980 is not credible because it is contradicted by Veteran's previous and predominant histories that his back pain began after a work accident in 1980. Furthermore, even if the Board were to find the history of intermittent symptoms since service credible, the Veteran has not provided a rationale for the determination that the symptoms were the result of a current disability rather than a different disorder or to acute episodes manifested by these symptoms, and the Board notes that he has not reported experience in orthopedic medicine or other experience that would provide him the specialized knowledge needed to make this determination. Based on the absence of probative evidence of a chronic thoracolumbar spine disability until many years after service and the VA examiner's probative determination that the thoracolumbar spine disability was not present during service, the Board finds the preponderance of the evidence establishes that the thoracolumbar spine disability was not present until after the Veteran's discharge from active duty. 

Additionally, the Board finds that the thoracolumbar spine disability was not incurred or aggravated during a period of duty for training. In this regard, the Board notes that the Veteran has not alleged that back injury during a period of duty for training or that chronic back pain began or was increased during a period of active duty for training: he has only reported injury in his civilian occupations and injury during the period of active duty. 

Furthermore, the preponderance of the evidence establishes that the Veteran's the thoracolumbar spine disability is unrelated to service. The VA examiner provided a probative opinion indicating that the thoracolumbar spine disability was not due to service, to include the in-service lifting injury, explaining that the thoracolumbar spine disability was consistent with the Veteran's age, particularly given his civilian work history. There is no contrary medical opinion of record. Although the appellant might believe that his thoracolumbar spine disability is related to service, the probative medical evidence does not corroborate these assertions, and although the Veteran is competent to provide medical statements based on his training as a registered nurse, he has not provided a medical rationale for his belief that the low back disability is related to service. Thus, the Board finds the Veteran's opinion is less probative than the medical opinion against the claim.
 
Accordingly, the claim must be denied. In reaching this decision, the Board has considered the doctrine of reasonable doubt but has determined that it is not applicable to this claim because the preponderance of the evidence is against the claim. 

C. Skin Disability

The Veteran has not reported treatment for a skin disability during active service. A July 1976 Reserve reenlistment examination record reveals normal clinical findings for the "head, face, neck, and scalp" and skin and negative history as to skin disease. The Veteran denied an interval change since the last physical. 

An August 2001 private treatment record indicates that the Veteran requested evaluation of a skin lesion. The record notes that the Veteran was referred to dermatology for skin cancer screening and lesion evaluation/treatment. 

A March 2006 treatment record reveals the Veteran's history of pre-cancer on the dorsum of the left hand which tends to open up and bleed. He also reported a spot in the ear that always has a scab and a tender spot over the eyebrow. Examination revealed lesions consistent with actinic keratosis on the right helix, right superior eyebrow, and right temple. An October 2006 VA treatment record reveals a recurrence of a scab on the right helix. The assessment was ear lesion. 

A December 2007 VA treatment record reveals the Veteran's history of significant skin problems. 

An October 2008 VA treatment record reveals the Veteran's history of a spot on the right wrist. The diagnosis was skin lesion, probably actinic keratosis. A December 2008 VA treatment record reveals a history of scab on the right ear. Examination revealed mild actinic keratosis on the right pinna. 

A May 2012 VA treatment record reveals the Veteran's history of skin lesion on the forehead for the previous six months. He reported past treatment for actinic keratosis. Examination revealed an ulcerated lesion with a hard center over the left eye. A May 2012 biopsy revealed squamous cell carcinoma on the left hand and left forehead. The carcinoma was excised in July 2012. 

A January 2013 VA treatment record reveals the Veteran's history of lesions on the face. Examination revealed actinic keratosis and a pink papule. A biopsy was done on the pink papule which revealed basal cell carcinoma. The carcinoma was excised in February 2013. A July 2013 VA treatment record reveals the Veteran's history of small red, rough bumps on the scalp and face. Examination revealed actinic keratoses and neoplasms of uncertain behavior at the left upper back and left temple. A September 2013 biopsy report reveals findings of lichenoid keratosis and incidental intradermal nevus on the left upper back and nodular basal cell carcinoma on the left temple. 

A December 2013 VA skin examination reveals the Veteran's history of basal cell carcinoma and squamous cell carcinoma in 2012 and 2013. The Veteran reported that the lesions were located on the forehead. He also reported treatment for actinic keratotic lesions on the face. The examiner found it was less likely than not that the skin condition was incurred in or caused by service. The examiner noted that 

 "UptoDate states the following in regard to risk in developing 
 basal or squamous skin cancer: Sun exposure is the most 
 important environmental cause of [basal cell carcinoma], and most 
 risk factors relate directly to a person's sun exposure habits or 
 susceptibility to solar radiation. These risk factors include having 
 fair skin, light-colored eyes, red hair, northern European ancestry, 
 older age, childhood freckling, and an increased number of
 past sunburns. 

The examiner reported that the Veteran was a mature male with fair skin and light colored eyes. The examiner found no evidence in the medical literature which would link exposures to herbicides with the development of skin cancer. 

A January 2014 VA treatment record reveals excision of a nodular basal cell carcinoma on the left temple. The biopsy report shows a dermal scar without evidence of residual tumor. An April 2014 VA treatment record reveals a finding of a spot on the nose that has been darkening for two to three months. He also reported spots on the arms. Examination revealed keratotic macules and papules on the face and scalp. The diagnosis was actinic keratosis. 

Following consideration of the evidence, the Board concludes service connection is not warranted for a skin disability. 

Initially, the Board finds a preponderance of the evidence shows that a skin disability was not present during active duty. Medical evaluations in the 1970s revealed no history or finding of a chronic skin abnormality, the 1976 Reserve examination revealed normal clinical findings and negative history as to skin disease, and the first diagnosis of record dates 36 years after separation from active duty and after discharge from Reserve and National Guard training. Additionally, although competent to do so, the Veteran has not reported skin abnormality during active service, to include a period of duty for training. Furthermore, a VA examiner has provided a probative opinion that the skin disability was not present during active duty. 

Furthermore, the preponderance of the evidence establishes that the Veteran's skin disability is unrelated to service. The VA examiner provided a probative opinion indicating that the skin disability was not due to service, to include the reported in-service herbicide exposure. There is no contrary medical opinion of record, and no medical evidence that herbicide exposure can result in skin cancer or actinic keratosis. Although the appellant might believe that his skin disability is related to service, the probative medical evidence does not corroborate these assertions, and the appellant has not provided a medical rationale for the belief that the skin disability is related to service. In this regard, the Board notes that the Veteran has not reported past sunburns during service which could be a cause of the skin disability and has not provided any support for the theory that the skin disability is related to herbicide exposure. In any event, the Veteran's opinion, even when considered with his training as a registered nurse, is less probative than the medical opinion against the claim.
 
Accordingly, the claim must be denied. In reaching this decision, the Board has considered the doctrine of reasonable doubt but has determined that it is not applicable to this claim because the preponderance of the evidence is against the claim. 


 (CONTINUED ON NEXT PAGE)



ORDER

A rating in excess of 20 percent for hepatitis C is denied. 

A rating in excess of 70 percent for a psychiatric disability is denied. 

A TDIU based on the hepatitis C and psychiatric disability prior to September 17, 2013, is denied. 

Service connection for a thoracolumbar spine disability is denied. 

Service connection for a skin disability is denied. 



____________________________________________
Shane A. Durkin
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs